UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **KENNETH CHARLES SAVAGE**<br>**SHARON M. SAVAGE** | **06-10169** |
| | CHAPTER 7 |
| DEBTORS | |
| **PORT LOUIS OWNERS ASSOCIATION, INC.** | ADVERSARY NO. |
| PLAINTIFF | **06-1151** |
| VERSUS | |
| **KENNETH CHARLES SAVAGE**<br>**SHARON M. SAVAGE** | |
| DEFENDANTS | |

## MEMORANDUM OPINION

Kenneth and Sharon Savage (collectively "Savages" or "Debtors") filed a voluntary petition under chapter 7 of the Bankruptcy Code on March 13, 2006. Shortly after their filing, the Port Louis Owners Association ("PLOA") filed this adversary proceeding, claiming unliquidated damages for fraud and embezzlement. The PLOA also alleged that the amounts owed were excepted from discharge under 11 U.S.C. §523.[1]

Debtors responded with a general denial and counterclaim based on breach of contract and mismanagement. A trial on the merits was held on February 7, 2007. At the conclusion of the trial, the Court took the matter under advisement.

---

[1] While the Complaint does not specify the sections of 11 U.S.C. § 523 upon which the prayer for relief is based, the Court finds that the allegations fall under sections 523(a)(2)(A) and (a)(4).

Venue is proper and the Court has jurisdiction over the issues presented pursuant to 28 U.S.C. §§ 157 and 1334.

**I. Facts**

The Savages own a home in a development commonly referred to as Port Louis. Port Louis is a collection of fifty-three (53) town homes grouped in common buildings. It is managed by the Port Louis Owner's Association ("PLOA"), a non-profit Louisiana corporation properly formed and registered with the Secretary of State. The PLOA is operated through a board of directors composed of a president, vice president, secretary and treasurer.

The PLOA enforces building and use restrictions over the town homes and maintains common areas. The Savages' building contains seven (7) separate units, all individually owned. The units share common walls and a common roof.

On January 29, 2004 an electrical fire broke out in the common wall between unit 15, owned by the Savages, and unit 16, owned by David Wilbur ("Wilbur"). The cause of the fire has not been determined although arson was eliminated as a possibility.

The day after the fire, Kenneth Savage (hereafter, when referring to Kenneth Savage, the Court will use the singular "Savage") met with David Burke, president of the PLOA ("Burke") and an insurance adjuster for Scottsdale Insurance Company ("Scottsdale") at his home. Scottsdale was the insurer of the town homes under a policy acquired by the PLOA. The policy insured all property owned by the PLOA against damages caused by fire. The Savages were not named or additional insureds under the policy.

Savage testified that at the initial meeting, Burke and the adjuster inspected the damage to his unit. During the inspection, Burke pointed out to the adjuster damages covered by insurance and

those not covered under the policy. At the meeting both Burke and Scottsdale took the position that the policy did not cover damages to the interior of the Savages' unit but only those damages sustained by the structure of the unit itself. Savage objected to this interpretation of the policy and voiced his displeasure to them both. It was the Savages' position that the policy covered all damage to the unit. The Savages carried no homeowner's insurance on their unit.

The damage to units 15 and 16 was extensive. The fire started on the first floor and traveled through the wall breaking through the roof on the third floor. Significant water damage was also sustained as a result of fire hoses used to quench the conflagration. Following the fire, both units were uninhabitable. Because Scottsdale's position was that it did not cover the interior of the units or the risk of loss to the Savages, the policy did not pay for the Savages' loss of use of the premises.

The adjustment of the PLOA claim took months. Scottsdale's initial adjustment was for $86,252.25 in covered damages for both units 15 and 16. The Savages and Wilbur disputed this adjustment, believing it insufficient to cover the structural damage, much less the damage to their interiors. After a couple of months, the Savages retained the services of an attorney, John Keller ("Keller"), to advise them as to their rights. Keller began his work by demanding that a timely resolution of the PLOA claim be made. He also asserted claims against the PLOA for delays in resolving the matter and failing to assert claims held by the Savages against Scottsdale for loss of property.

Emails were exchanged between several of the board members including Burke, Len Bahr, its secretary, Geri Cavarretta, its treasurer, and Neil Rudd ("Rudd"), a member of the association and vice president elect, regarding the demands of the Savages.[2]

---

[2] Defendant Exhibit 15.

In April of 2004 the board met and voted to allow the Savages to manage the reconstruction of units 15 and 16 as well as the insurance proceeds and claims filed with Scottsdale.[3] The Savages were given authority to execute construction contracts with third parties for the restoration of the structure, a responsibility of the PLOA. They were also given signatory authority on a special checking account, the PLOA Fire Restoration Account ("Fire Account"). The Fire Account was opened by the PLOA to handle the costs associated with the reconstruction of units 15 and 16.[4] The only deposits into the Fire Account were the proceeds received from the PLOA insurance policy and those of the PLOA. The Fire Account required the dual signatures of both Savages in order to withdraw funds. In late April 2004, the PLOA wrote Scottsdale advising them that the Savages had been authorized by board resolution to negotiate and settle the insurance claims of the PLOA against Scottsdale and resulting from the fire.

Immediately prior to the previously discussed board meeting, Scottsdale forwarded a check in the amount of $86,252.25 which was deposited into the Fire Account. Shortly after the board meeting, the Savages obtained three bids for costs to reconstruct both units. A low bid of $117,000 was received, but the Savages elected to contract with Marino Construction ("Marino") for the restoration of both units because Marino was immediately available. The combined contract price for repairs to units 15 and 16 totaled $209,760.00.[5] Although the contracts were for an amount in excess of that agreed to by Scottsdale, Savage signed the contracts on April 28, 2004

---

[3] Plaintiff Exhibit 33.

[4] *Id*.

[5] Defendants Exhibits 3 and 4.

("Marino Contracts"). The cost of the Marino Contracts was known to the PLOA who at least tacitly acquiesced in their execution.

The Marino Contracts do not detail the scope of work to be performed. Prior to the execution of the contracts, Marino itemized the estimated costs for various work to be performed. The total of the estimates for units 15 and 16 was $233,092.00, an amount in excess of the combined price of the Marino Contracts and the amounts forwarded by Scottsdale.[6]

An initial deposit of $20,979.00, or 10% of the contracts' price, was advanced by the Savages to Marino and work began immediately. Marino started the demolition, roof and other structural repairs to the units but encountered significant problems with mold. Scottsdale was contacted and retained Rimkus Consultants Group, Inc. ("Rimkus"), a company specializing in environmental testing. The units tested positive for mold and other pathogens, and Rimkus provided a plan for remediation.[7] Scottsdale requested a bid from Rugbusters, Inc. d/b/a SERVPRO of Slidell ("Servpro") for the cost to complete the abatement plan which totaled $33,326.19. Thereafter, Scottsdale forwarded a $33,326.19[8] check to cover the costs of mold remediation which was deposited by Savage into the Fire Account.

---

[6] Notated on Defendant Exhibit 3, for unit 15 are various handwritten numbers of Savage. Although Savage could not remember their importance, when they are substituted for the amounts originally reflected by Marino in its estimate of costs, they total $108,626.00 an amount remarkably close to the Marino Contract amount for unit 15. The estimates include no money for plumbing fixtures, trim carpentry, painting, cabinets or vanities. There is an allowance for finished flooring in the amount of $11,900.00.

[7] Defendant Exhibits 13 and 14.

[8] Through a separate adversary case, the amount of Servpro's estimate and the amount of Scottsdale's check was actually established to be $33,308.21. The difference does not affect the findings of this Court because the Court's findings rest on the total amounts deposited less amounts expended for the Marino contracts, charge-backs, and bank service charges.

Additional deposits were received from Scottsdale on June 2, 2004 ($9,159.51); July 2, 2004 ($33,326.19); July 13, 2004 ($3,400.00); November 30, 2004 ($1,100); and January 19, 2005 ($10,000).[9] In addition, the PLOA deposited $4,421.52 as the amounts owed under the policy deductible. Payments received from insurance and the PLOA total $176,546.16.

Payments made on the Marino Contracts total $116,252.50. The other amounts expended from the Fire Account by the Savages can be categorized:

| | |
|---|---|
| Attorney's Fees-Keller | $ 4,475.00 |
| Living Expenses-Savage | 21,250.00 |
| Living Expenses-Wilbur | 3,900.00 |
| Interior Restoration Expenses | 25,491.39 |
| Service charges and chargebacks | 3,413.02[10] |
| Storage | 1,750.00[11] |

The PLOA does not object to the use of funds from the Fire Account for payments to Marino. Nor does it object to bank service charges and charge-backs. Instead, the PLOA objects to the use of funds expended by the Savages for living expenses, attorney's fees and those payable to cash. It also objects to the checks made payable to Wilbur and signed by the Savages.

---

[9] Plaintiff Exhibit 32.

[10] This sum is composed of $9.52 in bank charges for check printing, a $3.50 NSF fee for a NSF check deposited into the account, and a $3,400.00 charge-back on that deposit.

[11] Savage testified that he rented three storage units. Two units were used to store personal items and the third was used to store building supplies Savage purchased. Since the Court finds that all supplies allegedly purchased by Savage were for the portions of the restoration not covered by insurance, their storage is not compensable out of insurance funds.

The PLOA avers that the use of insurance proceeds for living expenses, attorney's fees, and unaccounted for withdrawals constitutes false pretenses, false representations, actual fraud and theft.

## II. Law and Analysis

The Savages were, by board resolution, agents for the PLOA. Specifically, they were charged with the duty, and given the authority, to negotiate and settle any and all claims held by the PLOA against Scottsdale which arose as a result of the fire.[12] They were also given complete control over all insurance proceeds received and given the further authority to execute construction contacts in the name of the PLOA for the purpose of restoring units 15 and 16.

The PLOA was responsible, under Louisiana law, for the maintenance of the structures and common areas.[13] Insurance was acquired to guard against risk of loss on the parts of the building for which the PLOA was responsible. Beginning the day after the fire, Savage was aware that both the PLOA and Scottsdale read the PLOA policy to insure only damages to the structure and common areas. At the inspection after the fire, the PLOA's then president, Burke, made this position clear to Savage.

Rudd, the current president of the PLOA, testified that the PLOA policy covered any damages to the buildings from the exterior walls through and up to, but not including, the inside layer of paint. Similarly, the policy covered damage to the roof through to the interior ceiling layer of paint and from the ground to the subfloor but not the finished flooring. The costs to replace interior lighting fixtures, appliances, finish millwork, bathroom fixtures, cabinetry, and paint were some of the items not included under the policy. Both the PLOA and Scottsdale also disputed the

---

[12] Plaintiff Exhibit 33.

[13] La. R.S. 9:1123.07.

replacement of all the windows in the units. Rudd testified that only one window's replacement was authorized by Scottsdale.

From the beginning, Savage objected to this interpretation of the insurance contract, believing that it covered any losses sustained to the unit. Because Savage believed that Scottsdale's initial estimate was too low, he requested a new adjustment. On March 27, 2003 an estimate was prepared by Michael Orgeron ("Orgeron").[14] Orgeron's estimate was based on a Brandhurst Construction & Maintenance ("Brandhurst") estimate detailing all work (interior and structural) required to completely restore unit 15. Brandhurst estimated that the total cost involved would be $162,922.44.

A review of the Brandhurst estimate reveals that $105,091.86 is the estimated cost to repair the roof, exterior structure to the interior layer of paint, and subfloor. This roughly corresponds to the Marino Contract price of $107,470.00 for unit 15. The additional amounts itemized in the Brandhurst estimate ($57,830.58) are those associated with the restoration of the interior space including paint, finish millwork and carpentry, lighting, countertops, bathroom fixtures and finish flooring.

The parties agree that the insurance claim was for the reconstruction of both units. Although a similar Brandhurst estimate was not offered for unit 16, based on the total Marino Contract price of $209,790.00, the Court will assume a Brandhurst estimate for the damages to unit 16 would have been for a similar cost to that of unit 15.

---

[14] Defendant Pleading 11.

Following receipt of the Brandhurst estimate, Gillis, Ellis & Baker prepared a Sworn Statement in Proof of Loss for unit 15 in the amount of $196,230.65.[15] Scottsdale might have accepted some portion of the additional claim because after its date, additional funds were advanced eventually totaling $133,237.95 *for both units*.[16] However, Scottsdale does not appear to have ever accepted the Savages' total claim. In any event, $133,237.95 was substantially less than the aggregate price due under the Marino Contracts ($209,760.00) or any other estimate available to the Savages for the repair of the units. The Savages were well aware of this fact having retained counsel to sue Scottsdale for the additional costs to repair the structure as well as for the costs to repair the interior of their home. That suit is still pending.

In the meantime, the Savages utilized the funds forwarded for rebuilding the units' structures and those for mold remediation[17] to defray their personal expenses. The Savages diverted over $26,900.00 in funds for their living expenses and those of Wilbur.[18] They also diverted $4,475.00

---

[15] Defendant Exhibit 11. No explanation for this sum was supplied. The Court notes that it does not match the Marino Contract ($107,470.00) or the Brandhurst estimate ($162,922.44).

[16] The $10,000.00 received from Scottsdale on January 19, 2005 is not included in this total as it was for additional work, not included in the previous estimates and made necessary by Parish building requirements. Also not included were funds advanced for mold remediation which Rudd and Savage testified were in the amount of $33,326.19.

[17] In addition to construction costs, the Savages engaged Servpro to remediate damages to both units caused by mold and other pathogens. Rudd and Savage testified Scottsdale advanced $33,326.19 for mold remediation to cover the Servpro contract price, which the Savages deposited into the Fire Account. The $33,326.19 Scottsdale advanced was in addition to the $133,237.95 paid for construction costs.

[18] Defendant Exhibit 8 is a "Disbursement Schedule" ("Schedule") prepared by Savage. Savage testified that checks noted as for "ALE" on the Schedule are reimbursement for "additional living expenses." According to Savage, his additional living expenses were for rent, pet boarding fees and storage fees. He further testified that check nos. 121, 125 and 127 in the amounts of $1,300.00 each were "ALE" for Wilbur.

to pay the fees of their personal attorney. Finally, they utilized $25,491.39 in payments made to cash or Kenneth Savage for alleged reimbursements for flooring, lighting, cabinetry, bathroom fixtures, tile, and windows, not covered by insurance. While the Savages may have believed they could force Scottsdale to pay for these items, at the time of their expenditure, nothing could have assured them that this would actually occur. In fact, three years after the fire, Scottsdale has not paid any additional sums on the claims of the PLOA or the Savages.

### A. Section 523(a)(4) - Embezzlement

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[19] "Embezzlement" for the purposes of section 523(a)(4) is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[20]

"To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property."[21]

> A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.[22]

---

[19] The allegations in the Complaint support a basis for embezzlement. The Complaint did not allege "fraud or defalcation while acting in a fiduciary capacity." The phrase "while acting in a fiduciary capacity" does not modify "embezzlement." *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583, 587 n. 9 (5th Cir. 1987).

[20] *Miller v. J. D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) (citations omitted), *cert. denied*, 119 S. Ct. 1249, L.Ed.2d 347 (U.S. 1999).

[21] *Id., citing Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996); *In re Sokul*, 170 B.R. 556, 560 (Bankr.S.D.N.Y. 1994); and *cf. Coburn Co. v. Nicholas*, 956 F.2d 110, 111 (5th Cir. 1992).

[22] *In re Brady*, 101 F.3d at 1173.

"For a claim of embezzlement, the Plaintiff must establish fraud in fact although it can be proven through circumstantial evidence."[23] "Fraud in fact" "involves moral turpitude or intentional wrong."[24]

The Savages were well aware that the Fire Account lacked sufficient funds to complete the estimated structural damages to the building. With only $133,237.95 in insurance proceeds, they could not have presumed that the funds on hand would be sufficient to pay for insured losses, much less their personal losses. Further, the Marino Contracts themselves totaling $209,790.00 were $74,000.00 higher than the funds available for their satisfaction.

In addition, the Savages spent insurance funds advanced to remediate mold in both the units for purposes other than as intended. Servpro was retained by the Savages to remediate the mold in the units. Servpro's contract price was $33,326.19 for which Scottsdale advanced an additional $33,326.19 over the $133,237.95 paid for construction costs. While the Savages allege that Servpro did not properly perform its contract, it is clear that the Savages spent the $33,326.19 deposited in the Fire Account for personal purposes. Again, these funds were the proceeds of insurance owned by the PLOA and not the property of the Savages. If problems with Servpro's work excused payment, the funds were still owned by the PLOA and should have been maintained either for the eventual completion of remediation work or structural damages. They were not the Savages' asset to spend on the Savages' disputed damage claims.

The Savages converted funds designated for the repair of the structure of their unit and that of Wilbur for unauthorized purposes. Control over the insurance claim and the proceeds of the

---

[23] *Gillespi v. Jenkins (In re Jenkins)*, 110 B.R. 74, 76 (Bankr.M.D.Fla. 1990).

[24] *Smallwood v. Howell (In re Howell)*, 178 B.R. 730 (Bankr.W.D.Tenn. 1995).

PLOA policy was given to the Savages by board resolution. That resolution placed them as mandataries of corporate funds,[25] funds designed to pay for the reconstruction of the building structure. Despite the obvious fact that the funds on deposit in the Fire Account were insufficient to satisfy the costs of repair and mold remediation to the two units' structure, the Savages elected to use over $56,866.39[26] in funds for their personal benefit. These were not personal funds nor were they offered for personal use. As fiduciaries of the corporation, they are responsible for the proper use of its assets.[27] The Savages breached that trust, embezzling the funds to cover their own personal losses and those of Wilbur.

Based on these facts, the Court finds that the Savages intended to defraud the PLOA when they reimbursed themselves for living expenses, attorney's fees, storage fees and interior building materials. In sum, the Court finds that the Savages' fraudulently misappropriated $56, 866.39 of the insurance funds entrusted to them by the PLOA. Accordingly, the Court finds that the Savages owe the PLOA a $56,866.39 nondischargeable debt under section 523(a)(4).

---

[25] The board resolution provided the Savages the express authority required by La. Civil Code article 2997 for a mandatary to contract and to endorse negotiable instruments.

[26] The calculation of this sum is the result of adding all deposits made from insurance and the PLOA, deducting amounts paid to Marino and for bank charges and chargebacks, and deducting the account's ending balance of $14.25.

[27] La. Civil Code article 3001 provides that "[t]he mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. He is responsible to the principal for the loss that the principal sustains as a result of the mandatary's failure to perform." La. Civil Code article 3005 provides that "[t]he mandatary owes interest, from the date used, on sums of money of the principal that the mandatary applies to his own use."

### B. Section 523(a)(2)(A) - False pretenses, false representation, or actual fraud

Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud." For PLOA to prevail under this section, it must prove by a preponderance of evidence that : (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance.[28]

> Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin,* 963 F.2d 809, 813 (5th Cir.1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris,* 70 F.3d 27, 30 n. 12 (5th Cir.1995), citing *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994). Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive. *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir.1997). Thus, a "dumb but honest" defendant does not have scienter. *Id., citing* 2 F. Harper, *et al.,* Law of Torts § 7.3, at 393 (2d Ed.1986).[29]

The Fifth Circuit has found that a false representation does not have to be overt or spoken:

> When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required. Moreover, a misrepresentation need not be spoken; it can be made through conduct.[30]

---

[28] *General Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

[29] *Id.*

[30] *A T & T Universal Card Services v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001) (citations omitted).

The Court finds that the PLOA did not bear its burden of proving that the Savages made a representation to it either through silence or overt act. Therefore, the Court will base its finding of nondischargeability only on embezzlement under section 523(a)(4).

### C. Counterclaim

The Savages allege that the PLOA tardily processed the fire insurance claim thereby breaching a fiduciary duty owed to the Savages as PLOA members "to handle the insurance claims on the condominium unit in an expeditious manner to safeguard against further damage due to delay."[31] The Savages further allege that the PLOA breached "contracts" between the PLOA and themselves which provided for timely handling of insurance claims.[32]

The cause of action that is the subject of the counterclaim arose prior to the date the Savages filed their bankruptcy petition. Property of the estate includes "causes of action belonging to the debtor at the time the case is commenced."[33] Because the cause of action is property of the estate, the chapter 7 trustee is the proper party to assert these claims.[34] Therefore, Court finds that the Savages have no right of action to assert the counterclaim. Because the Savages failed to include this cause of action in their Schedules or Statement of Financial Affairs, the Court will order them to amend those documents.

---

[31] Pleading 14, p. 3.

[32] *Id.*

[33] *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 245 (5th Cir. 1988) (citations omitted); *also see* 11 U.S.C. § 541(a).

[34] *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001)(citations omitted); *also see* 11 U.S.C. § 704(a)(1).

**III. Conclusion**

The Court finds that the Savages owe the PLOA a $56,866.39 nondischargeable debt under section 523(a)(4) for embezzling insurance proceeds entrusted to them. The Court finds that the PLOA did not meet its burden of proof under section 523(a)(2)(A). Because the Court bases its findings of nondischargeability on embezzlement only, it will not award attorney's fees. However, the Court will award federal legal interest from the date of judicial demand as requested in the complaint.

The Court finds that the Savages do not have standing to assert the counterclaim. Therefore, their claims against the PLOA are denied.

A separate Judgment in accordance with this Memorandum Opinion will be entered.

New Orleans, Louisiana, April 13, 2007.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge